UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| MASSEYS JEWELERS, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Case No. |
| | ) | <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| TRIBUNE MEDIA COMPANY and SINCLAIR BROADCAST GROUP, INC., | ) ) ) | |
| Defendants. | ) ) | |
| | ) | <u>DEMAND FOR JURY TRIAL</u> |

**COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT**

Plaintiff Masseys Jewelers, individually and on behalf of all others similarly situated, brings this class action for damages, injunctive relief and other relief pursuant to federal antitrust laws. Plaintiff alleges the following based upon personal knowledge as to the facts pertaining to itself and upon information and belief as to all other matters.

## NATURE OF THE ACTION

1.      Local television stations are owned by large parent companies that generate revenue, in part, by selling local television ("TV") advertising.  Defendants Tribune Media Company and Sinclair Broadcast Group, Inc. (collectively referred to herein as "defendants") are among the largest owners of local television stations, operating stations across the country.  In recent years, the demand for TV ads has decreased as viewers migrate to online and other platforms, resulting in significant declines in TV ad revenue.  Rather than compete in this market and drive prices lower, defendants and their co-conspirators (named and unnamed) shared proprietary information on pricing and conspired to fix prices and reduce competition in the market.  This action arises from the unlawful, anticompetitive coordination between defendants' ad sales teams to artificially inflate the prices of local TV ads in violation of §1 of the Sherman Antitrust Act ("Sherman Act"), 15 U.S.C. §1.

2.      Plaintiff seeks to represent a Class consisting of all persons and entities in the United States who paid for all or a portion of advertising time on local TV provided by one or more of the defendants from at least January 1, 2014 until the effects of their unlawful conduct cease (the "Class Period").

## JURISDICTION AND VENUE

3.      Plaintiff's action arises under §1 of the Sherman Act.  Plaintiff seeks to recover damages suffered by the Class and the costs of suit, including reasonable attorneys' fees; to enjoin defendants' anticompetitive conduct; and for such other relief available, pursuant to §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331 and 1337, and §§4 and 16 of the Clayton Act, 15 U.S.C. §§15(a) and 26.

5.      Venue is proper in this District pursuant to §12 of the Clayton Act, 28 U.S.C. §22, and pursuant to 28 U.S.C. §1391(b)-(d) because a substantial part of the events giving rise to plaintiff's claims occurred in this District, and at all times relevant, one or more of the defendants resided, transacted business, was found, or had agents in this District.

## PARTIES

6.      Plaintiff Masseys Jewelers is a jewelry store based in Sandy, Utah.  During the Class Period plaintiff purchased TV ad time from KUTV, a local TV station owned by Sinclair Broadcast Group, Inc., and has suffered monetary loss as a result of the various antitrust violations alleged in this complaint.

7.      Defendant Tribune Media Company ("Tribune") is a media and entertainment company headquartered at 515 North State Street, Chicago, Illinois 60654.  Tribune offers news, entertainment, and sports programming through its local television stations.  Tribune owns 43 broadcast television stations in approximately 35 cities.

8.      Defendant Sinclair Broadcast Group, Inc. ("Sinclair") is a television broadcast company headquartered at 10706 Beaver Dam Road, Hunt Valley, Maryland 21030.  As of December 31, 2017, it owned, operated, or provided services to 191 stations in 89 markets, which broadcast 601 channels.

9.      The acts alleged against the defendants were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of defendants' businesses or affairs.

10.     It was announced in July 2018 that the Department of Justice ("DOJ") was investigating certain TV station owners regarding whether communications between sales teams led

to purchasers of TV advertising time paying higher rates. As Sinclair indicated in a recent SEC filing, the DOJ's investigation is broad and may be industry-wide. A spokesperson also said: "'It is our understanding that this is not specific to Sinclair, but focuses on the larger broadcast industry.'" Various persons and/or firms not named as defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof. Each defendant acted as the principal, agent, or joint venture of, or for, other defendants with respect to the acts, violations, and common course of conduct alleged by plaintiff. The complaint may be amended to add these entities.

## INTERSTATE TRADE AND COMMERCE

11.　　The actions complained of herein have restrained and adversely affected interstate commerce because defendants' transactions in local TV ads are entered into each year in interstate commerce in the United States and the payments for those transactions flowed in interstate commerce.

12.　　Defendants' manipulation of the market for the sale of local TV advertising had a direct, substantial, and foreseeable impact on interstate commerce in the United States. Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States, by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for local TV advertising. Absent defendants' combination, conspiracy, and/or agreement to manipulate the market for the sale of local TV advertising, the prices of local TV advertising would have been determined by a competitive, efficient market.

## FACTUAL ALLEGATIONS

**The Department of Justice Investigation**

13.　　On July 26, 2018, *The Wall Street Journal* reported that "[g]overnment officials [had] stumbled across [an] alleged ad sales practice during their review of Sinclair's $3.9 billion proposed

acquisition of Tribune."[1] The DOJ then commenced an investigation into "whether television station owners violated antitrust law in ways that inflated local television advertising prices." The article noted that the probe was looking into whether defendants Sinclair and Tribune and "other independent TV station owners coordinated efforts when their ad sales teams communicated with each other about their performance, potentially leading to higher rates for TV commercials."

14.     While Sinclair declined to comment "'on a potential investigation,'" its spokesman said: "'It is our understanding that this that this is not specific to Sinclair but focuses on the larger broadcast industry.'" *The Wall Street Journal* reported that other than Sinclair and Tribune, "some of the other largest independent station owners include Nexstar Media Group, Tegna Inc. and Hearst. Representatives for these companies declined to comment."

15.     In a recent SEC filing, Sinclair also acknowledged that it was facing allegations like those in this Complaint, stating: "The Company believes the lawsuits may have been related to media reports of a Civil Investigative Demand (CID) the Company received from the Department of Justice earlier this year, which regarded an investigation to determine whether there had been a violation of the Sherman Act by sharing of pace data within the industry. The CID indicated that it was issued in connection with the Company's acquisition of Tribune."[2]

16.     The *Chicago Tribune* confirmed that the investigation "grew out of the Antitrust Division's examination of Sinclair's proposed merger with Tribune," which was "now in doubt," adding:

> Sinclair's merger with Tribune Media faced an Aug. 8 deadline for either side
> to walk away from the deal. If they proceed with their merger plans, they would

---

[1]     Drew FitzGerald & Keach Hagey, *Justice Department Investigates TV Station Owners Over Advertising Sales*, Wall St. J. (July 26, 2018), https://www.wsj.com/articles/justice-department-investigates-tv-station-owners-over-advertising-sales-1532633979?mod=hp_lead_pos4.

[2]     Sinclair Broadcast Group, Inc., Quarterly Report (Form 10-Q) (Aug. 8, 2018).

likely face months, if not a year, of proceedings before the administrative judge. Other companies who have faced such a prospect have abandoned their plans.[3]

17.     The merger between Sinclair and Tribune ultimately failed, with the parties abandoning it because of heightened regulatory scrutiny brought about after Sinclair appeared to have attempted to skirt federal law.   Ajit Pai, the chairman of the Federal Communications Commission ("FCC"), said in a statement: "'Based on a thorough review of the record, I have serious concerns about the Sinclair/Tribune transaction.'"[4]   Those concerns were that Sinclair, despite promises to divest certain stations to have the merger approved, would retain control over those stations "'in practice, even if not in name, in violation of the law.'"   *Id.*

18.     It is significant that defendants' anticompetitive behavior is the subject of a DOJ investigation, a measure only taken when there is "reason to believe that an antitrust violation may have been committed."   "The Division does not begin a formal investigation until the Front Office determines that an investigation should proceed and the Division's resources should be committed."[5]   According to the *Antitrust Division Manual*:

> Generally, the factors considered in authorizing a preliminary investigation by the Division include: (a) whether there is reason to believe that an antitrust violation may have been committed; (b) what amount of commerce is affected; (c) if the investigation will duplicate or interfere with other efforts of the Division, the FTC, a United States Attorney, or a state attorney general; and (d) whether allocating resources fits within the needs and priorities of the Division.

*Id.*, Chapter III, Part B.1.

---

[3]     Ted Johnson, *Justice Department investigating Sinclair, Tribune Media over ad sales communications*, Chi. Trib. (July 27, 2018), http://www.chicagotribune.com/business/ct-biz-justice-department-sinclair-tribune -media-advertising-20180727-story.html.

[4]     FCC, Press Release, *Statement of Chairman Ajit Pai on Sinclair/Tribune Transaction* (July 16, 2018), https://www.fcc.gov/document/statement-chairman-ajit-pai-sinclairtribune-transaction.

[5]     Department of Justice, Antitrust Division, *Antitrust Division Manual* Chapter III, Part A (5th Ed. 2015) (the "*Antitrust Division Manual*").

**The Local TV Ad Market**

19.     The local TV landscape in the United States is made up of a few large media conglomerates (two of whom are defendants here) who own local stations that carry programming distributed through their broadcast platform.  Programming may be provided by third-party networks and syndicators, by local news divisions, their own networks and other original programming.

20.     In a typical competitive market, local TV companies compete for audience share and advertising revenue with other television stations in their respective Designated Market Areas ("DMA").  According to Sinclair's 2017 Form 10-K, filed with the SEC on March 1, 2018, other factors that are material to a TV station's competitive position include signal coverage, local program acceptance, network affiliation or program service, audience characteristic and assigned broadcast frequency.

21.     The sale of commercial inventory on respective TV stations to advertising customers is a primary source of revenue for broadcasting companies, including defendants.  The objective of the local TV station owner is to meet the needs of its advertising customers by delivering to significant audiences in key demographics.  Local TV ad revenue can vary substantially from period to period based on a number of factors, including a station's ability to attract and maintain local, national and network advertising.

22.     Recently there has been a rush toward consolidation in the local TV market, spurred by government deregulation,[6] as companies have experienced a significant slowing of growth in ad revenues generally.  As *The Wall Street Journal* has reported:

---

[6]     "The aggregation of stations in regional clusters has become vital to big broadcast groups because viewership of local TV news is generally on the decline.  Ratings for late local newscasts, which used to be a license to print money for successful stations, are down 31% since 2007, according to Pew Research Center's just-released Local TV News Fact Sheet."  Cynthia Littleton, *Local TV News Feels Squeeze Amid Station Consolidation*, Variety (July 25, 2017), https://variety.com/2017/tv/news/local-news-sinclair-tribune-nexstar-deal-1202506598/.

The local television industry has been rapidly consolidating in recent years, as broadcasters look to gain leverage with the pay TV distributors that carry their stations, and the networks that supply programming. Relaxed regulations on ownership have partly fueled the deals.

The fees stations get from carriage on cable and satellite systems is a major source of revenue. But advertising remains crucial. TV stations have long been the dominant advertising outlet for local businesses like car dealerships and are major players in election advertising. They have faced increased competition from digital players like Google and Facebook.[7]

23. A 2017 report from the Pew Research Center noted, "[t]he local television landscape in the U.S. has undergone major changes in recent years, as a wave of consolidations and station purchases have made some broadcast media owners considerably larger."[8]

24. In 2004, the five largest companies in local TV – Sinclair, Nexstar Media Group, Inc., Gray Television, Inc., Tegna, Inc., and Tribune – owned, operated or serviced 179 full-power stations, according to a Pew Research Center analysis of SEC filings data. That number grew to 378 in 2014 and to 443 in 2016.

---

[7] Drew FitzGerald and Keach Hagey, *Justice Department Investigates TV Station Owners Over Advertising Sales*, Wall St. J. (July 26, 2018), https://www.wsj.com/articles/justice-department-investigates-tv-station-owners-over-advertising-sales-1532633979.

[8] Katerina Eva Matsa, *Buying spree brings more local TV stations to fewer big companies*, Pew Res. Ctr. (May 11, 2017), http://www.pewresearch.org/fact-tank/2017/05/11/buying-spree-brings-more-local-tv-stations-to-fewer-big-companies/.



**Buying binge continues for local TV companies**

*Number of local TV stations owned by each company, as reported in SEC filings*

Note: Counts include stations that are reported in each company's SEC filing for each year ending Dec. 31 as being owned, operated or provided with programming and/or sales and other services. Low-power and satellite stations are excluded.
Source: Individual media company annual reports and SEC filings.

**PEW RESEARCH CENTER**

25.     The expansion by these major companies has been fueled by deregulation efforts at the FCC.  The FCC sets limits on the number of broadcast stations an entity can own, as well as limits on the common ownership of broadcast stations and newspapers.  "As required by Congress, the FCC reviews its media ownership rules every four years to determine whether the rules are in the public interest and to repeal or modify any regulation it determines does not meet this criteria."[9]

26.     For example, currently the FCC's rules prohibit common ownership of a full-power broadcast station and daily newspaper if the station's contour (defined separately by type of station) completely encompasses the newspaper's city of publication and the station and newspapers are in

---

[9]     FCC, *Consumer Guide: FCC Broadcast Ownership Rules* (Dec. 27, 2017),  https://www.fcc.gov/consumers/guides/fccs-review-broadcast-ownership-rules.

the same relevant Nielsen market, when defined.[10] There are also rules regarding the number of TV stations that can be owned by a single entity in the same DMA.

27.     The rules regarding national TV ownership are also managed by the FCC. For example, the National TV Ownership rule does not limit the number of TV stations a single entity may own nationwide so long as the station group collectively reaches no more than 39% of all U.S. TV households. For the purposes of calculating the "national audience reach," TV stations on UHF channels (14 and above) count less than TV stations operating on VHF channels (13 and below), this is also known as the UHF Discount. The National TV Ownership rule is no longer subject to the FCC's quadrennial review.[11]

28.     Many of these provisions are soon expected to be changed or even reversed under the current FCC. And many modifications leading to increased consolidation have already occurred.

29.     In particular, until recently, the FCC restricted the combined number of TV and radio stations that one party could own in a market to two TV stations and six radio stations, depending on the number of independent media voices in the market, and prohibited the common ownership of a radio or TV broadcast station and a daily newspaper in the same market. In November 2017, the FCC released an Ownership Order on Reconsideration that eliminated these restrictions effective February 7, 2018.[12]

30.     Market consolidation has coincided with a decline in local TV popularity. As markets are rapidly changing with the growth of digital channels and new alternative video entertainment options (*e.g.*, Netflix, Hulu, Amazon Prime Video, YouTube, Sling, and other streaming and app- or internet-based services), local TV stations have suffered. Ratings are down

---

[10]     *Id.*

[11]     *Id.*

[12]     *See In re 2014 Quadrennial Regulatory Review*, 32 FCC Rcd. 9802 (2017).

and many viewers have "cut the cord" and cancelled broadcast and cable subscriptions in favor of streaming and digital services. These massive shifts in how Americans consume media add pressure on traditional TV-ad-division profit margins:

> "The shift of audiences to OTT [over-the-top] viewing is changing the climate of the TV ad market," eMarketer senior forecasting director Monica Peart said in a statement. "As ratings for TV programming continue to decline, advertiser spending will also continue to see declines, especially in years that do not boast major events such as presidential elections and Olympic games."[13]

31. A February 2018 *Bloomberg* report noted that TV advertising sales in the United States fell 7.8% to $61.8 billion last year, which was

> the steepest drop outside of a recession in at least 20 years, while sales at cable networks slumped for the first time in almost a decade. And there's no sign of a pickup in 2018, excluding cyclical events like the Olympics and the midterm elections, according to data from Magna Global.[14]

32. Defendants and co-conspirators have responded to this decline in ad sales, not by competition, but by consolidating and colluding on TV ad prices, forcing plaintiff and members of the proposed Class to pay supracompetitive prices for local TV ads.

**The Structure of the Market for Local
TV Ads Is Conducive to Conspiracy**

33. The structure and characteristics of the market for local TV advertising make it conducive to anticompetitive conduct. Specifically, the industry is rapidly consolidating and becoming increasingly concentrated, has high barriers to entry and is made up of participants who have ample motive, means and opportunity to conspire.

---

[13] Erik Oster, *TV's Share of Ad Spend Expected to Continue Its Decline This Year*, Adweek (Mar. 28, 2018), https://www.adweek.com/agencies/tvs-share-of-ad-spend-expected-to-continue-its-decline-this-year/.

[14] Lucas Shaw, *Advertisers Tuning Out TV in Sign of Trouble for Media Companies*, Bloomberg (Feb 14, 2018), https://www.bloomberg.com/news/articles/2018-02-14/advertisers-tuning-out-tv-in-sign-of-trouble-for-media-companies/.

**Rapid Consolidation in the Local TV Market**

34.     A highly concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.  Local TV markets have been consolidating in recent years while ad spending has reduced, creating fertile ground for collusion.

35.     The now-abandoned Sinclair/Tribune merger would have created the largest station owner in the United States from the first- and fifth-largest TV station owners.

36.     In February of this year, E.W. Scripps Co. – another local television station owner – indicated that its "'priority is in-market consolidation to create duopolies.'"[15]

37.     *Axios* reports that changes in the broadcasting rules, "combined with new types of competition in news and entertainment, are creating a drama-filled free-for-all as local U.S. broadcasters consolidate."[16]  The changes to the ownership rule "will impact the entire local TV landscape, which is currently dominated by roughly a dozen companies."[17]

38.     The failure of the Sinclair/Tribune merger "doesn't mean the industry will stop consolidating."[18]  In fact, just the opposite seems to be occurring.  As *Axios* reported:

- Sinclair says it will likely pursue other deals to acquire more local stations, but analysts and industry experts say that its poor behavior could make it difficult to pursue other acquisitions.

- Tribune will likely sell its stations to another local broadcaster, but its CEO said in an email to employees obtained by Axios that it is focusing on remaining "one of the preeminent broadcasting companies in America."

---

[15]     *More TV Consolidation Ahead as Major Players Plot Merger Plans*, Insideradio (Feb. 6, 2018), http://www.insideradio.com/free/more-tv-consolidation-ahead-as-major-players-plot-merger-plans/article_916a7dd8-0b0e-11e8-81c3-1b954ca8a63e.html.

[16]     Sara Fischer, *The local TV consolidation race is here*, Axios (Aug. 10, 2018), https://www.axios.com/the-local-tv-consolidation-war-is-here-7c65f3fb-eaab-43c4-9a00-81303867dbee.html.

[17]     *Id.*

[18]     *Id.*

- 21st Century Fox was supposed to buy seven Tribune stations from Sinclair once the deal went through. They are likely to continue to look for other acquisitions.

- Gray Television is buying Raycom in a deal valued at $3.6 billion. It likely wouldn't face regulatory hurdles as it is currently below the broadcast ownership cap of 39%.

- Cox Enterprises says it plans to sell 14 TV stations across the country through mergers or a partnership with a large ownership group.

- Scripps purchased Katz Broadcast networks, four targeted TV stations, in 2017 and recently sold its radio stations to focus on growing its TV business.

- Nexstar, Meredith and Tegna would also be in the position to buy up other stations to expand their footprint.

- Univision's business is in a complicated position following a failed IPO. Its new CEO says he wants to focus the Spanish broadcaster's efforts on investing in Univision's local stations, among other priorities.[19]

39.     If the Gray Television/Raycom deal noted above is completed, the combined company would own 142 TV stations in 92 U.S. markets, reaching 24% of TV households and owning the third-largest number of stations. As *The Wall Street Journal* reported: "The move comes amid consolidation in the TV industry as station owners look to increase their leverage with broadcast networks, which supply much of their programming, and pay-TV distributors, which carry their channels."[20]

**High Barriers to Entry Create Conditions
for Anticompetitive Conduct to Thrive**

40.     An agreement that raises prices above competitive levels would, under standard economic principles, attract new entrants who would try to benefit from the supracompetitive pricing. But where there are high barriers to entry, new entrants are unlikely to enter the market.

---

[19]   *Id.*

[20]   Austen Hufford, *Gray TV to Buy Raycom in $3.65 Billion Deal*, Wall St. J. (June 25, 2018), https://www.wsj.com/articles/gray-tv-to-buy-raycom-in-3-65-billion-deal-1529932732.

41.     High barriers to entry help foster and facilitate the formation and maintenance of cartels.  Even though convergence and technological changes have lowered certain barriers to entry, new entrants planning to enter into broadcasting markets typically face six critical barriers: (1) governmental policy; (2) the presence of dominant broadcasters; (3) access to content; (4) audience behavior; (5) consumer costs; and (6) capital requirements.[21]

42.     Governmental policy, including the availability or lack thereof of broadcast licenses, can erect a market barrier.

43.     "Barriers to accessing content can arise from the integration of content owners and broadcasters, exclusive contractual arrangements or from vertical foreclosures by a dominant firm."[22]  Where there are dominant broadcasters, "[s]uch broadcasters usually have a long-established relationship with the viewers and most likely also with advertisers, which has to be challenged by new entrants."[23]

44.     Access to content is also critical:

> Successful entry into television broadcasting markets requires access at reasonable prices to desirable programming.  Access to such programming refers both to its production and/or acquisition from third parties.  Acquisition of some of the content, which may turn out to be critical to attract viewers, is likely to constitute a significant cost to new market players.[24]

45.     Finding and maintaining an audience is also critical and creates a barrier to entry:

> In the presence of established dominant broadcasters, new entrants have to come up with offers sufficiently attractive to convince viewers to alter their existing patterns of viewing and channel choice.  Commercial broadcasters, whose operations are

---

[21]     R.G. Picard and B.S. Chon, *Managing Competition Through Barriers to Entry and Channel Availability in the Changing Regulatory Environment*, The Int'l J. on Media Mgmt. 170-71 (2004), http://www.robertpicard.net/PDFFiles/managingcompetition.pdf at 168-175.

[22]     OECD, *Policy Roundtables: Competition Issues in Television and Broadcasting* (2013), http://www.oecd.org/daf/competition/TV-and-broadcasting2013.pdf.

[23]     *Id.*

[24]     *Id.*

financed through advertising fees, need to establish within a rather short period of time an audience base that will attract a sufficient number of advertisers.[25]

46.    Consumer costs include high switching costs (as between for example satellite services or cable and the associated costs of equipment).[26]

47.    Finally, capital requirements also impose high barriers to entry – where the level of capital needed is "prohibitively high, it may constitute a significant barrier to entry."[27]  The time, technical know-how and money needed to come close to what defendants here possess is nearly insurmountable.  Defendants are major firms that are acquiring more share and stake in the industry, driving down the ability of new entrants to compete in the market.

**Defendants' Had Motive and Opportunity
to Engage in the Conspiracy Alleged**

48.    According to an article in *AdAge*, not counting recessions, TV ad revenue fell more last year than at any time in the past 20 years:

> The decline in TV viewership is accelerating as online rivals Google and Facebook have increased their investments in video, capturing almost every new advertising dollar entering the marketplace.  TV ad sales have fallen even as global advertising grows, leading research firms and analysts to predict that the business may not return to growth.[28]

49.    Almost half of the growth in local video ad spending during the next five years will go to digital platforms, including local mobile video, local online video and out-of-home video, according to a new study on advanced TV advertising published by BIA/Kelsey industry analysts.[29]

---

[25]    *Id.*

[26]    *Id.*

[27]    *Id.*

[28]    *Not Counting Recessions, TV Ad Revenue Just Fell More than in at Least 20 Years*, AdAge (Feb. 14, 2018), http://adage.com/article/media/moreadvertisers-tuning-tv/312369/.

[29]    Gary Arlen, *Digital Catching Up to Cable in Local Ad Sales, Multichannel News* (Oct. 2, 2017), https://www.multichannel.com/blog/digital-catching-cable-local-ad-sales-415657.

50.     According to Sinclair's most recent Form 10-K, a primary source of revenue for local television stations is "the sale of commercial inventory on . . . television stations to . . . advertising customers." However, Sinclair also concedes that "advertising revenue can vary substantially from period to period based on many factors beyond [its] control." Further, "[t]his volatility affects [its] operating results and may reduce [its] ability to repay indebtedness or reduce the market value of [its] securities." Sinclair specifically admits that its "operating results depend on the amount of advertising revenue [it] generate[s]." [30]

51.     Defendants rely heavily on ad revenue in order to operate. In the face of massive declines in sales, they had reason and opportunity to conspire on ad rates.

52.     Defendants had numerous opportunities to meet and conspire. In particular, almost 300 full-power local TV stations changed hands in 2013 and many of these deals resulted in stations in the same market being separately owned on paper but operated jointly, a practice that has grown exponentially in recent years. Specifically, Sinclair admits that "[c]ertain of [its] stations have entered into agreements with other stations in the same market, through which [it] provide[s] programming and operating services[,] . . . sales services[,] and other non-programming operating services."[31]

53.     Additionally, defendants and their co-conspirators had numerous opportunities to conspire through industry associations such as the Television Bureau of Advertising, Inc. ("TVB"), the National Association of Broadcasters ("NAB"), and the Media Rating Council ("MRC"), conferences and meetings held by those associations, and through merger negotiations. "TVB is the not-for-profit trade association representing America's $21 billion local broadcast television

---

[30]     Sinclair Broadcast Group, Inc., Annual Report (Form 10-K) (Mar. 1, 2018).

[31]     *Id.*

industry.  Its members include over 800 individual television stations, television broadcast groups, advertising sales reps, syndicators, international broadcasters and associate members."[32]

54.    The NAB bills itself as

the voice for the nation's radio and television broadcasters.  As the premier trade association for broadcasters, NAB advances the interests of our members in federal government, industry and public affairs; improves the quality and profitability of broadcasting; encourages content and technology innovation; and spotlights the important and unique ways stations serve their communities.[33]

NAB conducts numerous conferences, including the NAB Show, a yearly event that attracts more than 100,000 attendees.[34]

55.    Sinclair and Tribune, along with other major firms like Hearst, Nexstar, and Tegna, are members of TVB.[35]  Sinclair, Tribune, and other major broadcast TV companies are also members of the NAB.  Sinclair's President and CEO, Tribune's COO, Gray Television's Chairman, President and CEO, and  Nexstar's Chairman, President and CEO all serve on the NAB Television Board of Directors.[36]  Several of these companies are also participants in the TV Interface Practices, or TIP, Initiative.  This "industry work group" provides a place for defendants to "actively work[] together."[37]

---

[32]    TVB, *Local Media Marketing Solutions*, http://www.tvb.org/AboutTVB.aspx.

[33]    NAB, *About Us*, https://www.nab.org/about/default.asp.

[34]    NAB, Press Release, *2017 NAB Show Attendance Surpasses 103,000* (Apr. 25, 2017), https://www.nab.org/documents/newsroom/pressRelease.asp?id=4152.

[35]    TVB, *Local Media Marketing Solutions*, http://www.tvb.org/Public/MarketsStations/BroadcastGroups.aspx.

[36]    NAB, *NAB Board of Directors*, https://www.nab.org/about/nabBoard.asp.

[37]    *Local Television Broadcasters' TIP (TV Interface Practices) Initiative to Accelerate Electronic Workflow for TV Advertising Transactions*, Business Wire (Nov. 20, 2017), https://www.businesswire.com/news/home/20171120005141/en/Local-Television-Broadcasters-%E2%80%99-TIP-TV-Interface-Practices.

56.     The MRC also serves as a conduit for defendants.  Sinclair, Tribune, Gray Television, Hearst, Nexstar, Tegna, and several other local TV station owners are also members of MRC.[38] MRC boasts that one of the "[b]enefits of MRC [m]embership" is that "[m]embers are exposed to other members' ideas and thoughts" and that "[m]embers can attend formal education seminars" together.[39]

## CLASS ACTION ALLEGATIONS

57.     Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following (the "Class"):

> All persons and entities in the United States who paid for all or a portion of the cost of advertising time directly to defendants, or any current or former subsidiary or affiliate of defendants, or any co-conspirator, during the period from at least and including January 1, 2014 until the effects of defendants' unlawful conduct cease. Excluded from the Class are defendants, their parent companies, subsidiaries, affiliates, agents, co-conspirators, federal governmental entities and instrumentalities of the federal government, and states and their subdivisions, agencies and instrumentalities.

58.     Members of the Class are so numerous that joinder would be impracticable.  Plaintiff does not know the exact number of Class members, but because of defendants' nationwide presence and the number of local TV ads, plaintiff believes the Class members number in the hundreds or thousands and that they are dispersed throughout the country.

59.     Common questions of law and fact exist as to all members of the Class.  Defendants' unlawful anticompetitive conduct was generally applicable to all the members of the Class, thereby making appropriate relief with respect to the Class as a whole.  Questions of law and fact common to the Class include, but are not limited to:

---

[38]   *2018 Membership*, Media Rating Council, http://mediaratingcouncil.orgMember%20Companies.htm.

[39]   *The Benefits of MRC Membership*, Media Rating Council, http://mediaratingcouncil.org/Benefits.htm.

(a)     Whether defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of local TV advertising time;

(b)     The identity of the participants in the alleged conspiracy;

(c)     The duration of the alleged conspiracy and the acts carried out by defendants and their co-conspirators in furtherance of the conspiracy;

(d)     Whether the alleged conspiracy violated §1 of the Sherman Act;

(e)     Whether the conduct of defendants and their co-conspirators, as alleged in this complaint, caused injury to the business or property of plaintiff and the members of the Class;

(f)     Whether the defendants and their co-conspirators fraudulently concealed the existence of their anticompetitive conduct from plaintiff and the members of the Class;

(g)     The appropriate injunctive and related equitable relief for plaintiff and the Class; and

(h)     The appropriate class-wide measure of damages.

60.     Plaintiff's claims are typical of the claims of the members of the Class, and plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff and all members of the Class are similarly affected by defendants' unlawful conduct in that they paid artificially inflated prices for local TV advertising time provided by defendants and/or their co-conspirators.

61.     Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class.  Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of antitrust and class action litigation.

62.     Questions of law and fact common to the members of the Class predominate over any questions only affecting individual members, including legal and factual issues relating to liability and damages.

- 18 -

63.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Class treatment will enable a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.

64.     This case is also manageable as a class action. Plaintiff knows of no difficulty to be encountered in the prosecution of this action that would preclude its maintenance as a class action. In any event, the benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

### ACCRUAL OF CLAIMS, CONTINUING VIOLATIONS, EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

65.     Any applicable statute of limitations has been tolled by defendants' knowing and active concealment of their unlawful conduct. Throughout the Class Period, defendants and their co-conspirators affirmatively and fraudulently concealed their price-fixing conspiracy.

66.     Plaintiff and the Class members did not discover, nor could they have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein prior to disclosure of a DOJ investigation of certain defendants on July 26, 2018.

67.     The very nature of defendants' conspiracy was secret and self-concealing. Defendants engaged in market manipulation that could not be detected by plaintiff and members of the Class.

68.     As alleged herein, defendants' collusion to fix prices in the market for the sale of local TV advertising was material to plaintiff and members of the Class at all relevant times. Plaintiff or the Class members could not have discovered the violations until shortly before this litigation was commenced because defendants and their co-conspirators used and continue to use deceptive methods to avoid detection and to affirmatively conceal their violations.

69.     Plaintiff and members of the Class did not discover, and did not know of any facts that would have caused a reasonable person to suspect, that defendants and their co-conspirators were colluding to fix, maintain, stabilize, and/or artificially inflate prices for TV advertising.

70.     During the limitations period, each of the defendants knowingly, actively, and affirmatively concealed the facts alleged herein, including their collusion to fix, maintain, stabilize, and/or artificially inflate prices for TV advertising.

71.     Plaintiff and Class members reasonably relied on defendants' knowing, active, and affirmative concealment.  As a result of defendants' fraudulent concealment, all applicable statutes of limitations affecting the plaintiff's and the Class members' claims have been tolled.

## PLAINTIFF AND THE CLASS SUFFERED ANTITRUST INJURY

72.     Defendants' antitrust conspiracy had the following effects:

(a)     Price competition has been restrained or eliminated with respect to local TV advertising;

(b)     The prices for local TV ads have been fixed, raised, maintained and/or stabilized at artificial levels;

(c)     Purchasers of local TV ad time have been deprived of the benefits of free and open competition; and

(d)     Purchasers of local TV ad time paid artificially inflated prices.

- 20 -

73.     The purpose of the conspiratorial and unlawful conduct of defendants and their co-conspirators was to fix, raise, stabilize and/or maintain the price of local TV advertising time.

74.     The amount of the overcharge impacting the prices of local TV advertising time paid by plaintiff and the Class can be measured and quantified using well-accepted methods.

75.     By reason of the alleged violations of the antitrust laws, plaintiff and the members of the Class have sustained injury to their businesses or property, having paid higher prices for local TV advertising time than they would have paid in the absence of defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent, and plaintiff is the proper party to bring these claims against defendants.

## COUNT

### For Violation of §1 of the Sherman Act, 15 U.S.C. §1

76.     Plaintiff repeats the allegations set forth above as if fully set forth herein.

77.     From at least January 1, 2014 until the effects of their unlawful conduct ceases, defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy with regard to local TV advertising in unreasonable restraint of trade in violation of §1 of the Sherman Act, 15 U.S.C. §1.

78.     The contract, combination or conspiracy consisted of an agreement among the defendants and their co-conspirators to fix, raise, stabilize or maintain at artificially high levels the prices they charged for local TV advertising time in the United States.

79.     In formulating and effectuating this conspiracy, defendants and their co-conspirators did those things that they combined and conspired to do, including:

(a)     Participating in meetings and conversations among themselves during which they agreed to charge prices at certain levels, and otherwise to fix, increase, maintain, or stabilize prices of local TV ads in the United States; and

(b)     Participating in meetings and conversations among themselves to implement, adhere, and police the agreements they reached.

80.     Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, raise, or stabilize prices of local TV advertising time.

81.     Defendants' conspiracy had the following effects, among others:

(a)     Price competition in the market for local TV ads has been restrained, suppressed, and/or eliminated;

(b)     Prices for local TV advertising time provided by defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)     Plaintiff and members of the Class who purchased local TV advertising time from defendants and their co-conspirators have been deprived of the benefits of free and open competition.

82.     Plaintiff and members of the Class have been injured and will continue to be injured in their business and property by paying more for local TV advertising time purchased from defendants and their co-conspirators, than they would have paid and will pay in the absence of the conspiracy.

83.     The conduct alleged is a *per se* violation of the federal antitrust laws.

84.     Plaintiff and members of the Class are entitled to treble damages and an injunction against defendants to prevent and restrain the violations alleged herein.

- 22 -

## PRAYER FOR RELIEF

WHEREFORE, plaintiff and the Class respectfully request that the Court:

A.      Determine this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.      Designate plaintiff as representative of the Class;

C.      Adjudge and decree that the acts of defendants are illegal and unlawful, including that the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by defendants and their co-conspirators, are a *per se* violation of §1 of the Sherman Act, 15 U.S.C. §1;

D.      Permanently enjoin and restrain defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.      Enter judgment against defendants, jointly and severally, and in favor of plaintiff and members of the Class for treble the amount of damages sustained by plaintiff and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this complaint to the extent provided by law; and

F.      Award plaintiff and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.

DATED: September 6, 2018          ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                    PATRICK J. COUGHLIN
                                    DAVID W. MITCHELL
                                    ALEXANDRA S. BERNAY
                                    CARMEN A. MEDICI (Gen. Bar No. 248417)

                                           *s/ Carmen A. Medici*
                                           CARMEN A. MEDICI

                                    655 West Broadway, Suite 1900
                                    San Diego, CA 92101-8498
                                    Telephone: 619-231-1058
                                    619-231-7423 (fax)
                                    E-mail: patc@rgrdlaw.com
                                           davidm@rgrdlaw.com
                                           xanb@rgrdlaw.com
                                           cmedici@rgrdlaw.com

                                    ROBBINS ARROYO LLP
                                    BRIAN J. ROBBINS
                                    GEORGE C. AGUILAR
                                    600 B Street, Suite 1900
                                    San Diego, CA 92101
                                    Telephone: 619/525-3990
                                    619/525-3991 (fax)
                                    E-mail: brobbins@robbinsarroyo.com
                                           gaguilar@robbinsarroyo.com

SILVERMAN|THOMPSON|SLUTKIN|WHITE
STEPHEN G. GRYGIEL
WILLIAM N. SINCLAIR
201 N. Charles Street, Suite 2600
Baltimore, MD  21201
Telephone:  410/385-2225
410/547-2432 (fax)
E-mail:  sgrygiel@mdattorney.com
         bsinclair@mdattorney.com

Attorneys for Plaintiff

ROBBINS GELLER RUDMAN
  & DOWD LLP
JAMES E. BARZ (IL Bar # 6255605)
FRANK RICHTER (IL Bar # 6310011)
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)
E-mail:  jbarz@rgrdlaw.com
         frichter@rgrdlaw.com

Local Counsel

I:\Admin\CptDraft\Antitrust\CPT TV Ad Collusion.docx